FILED

2017 Jan-20  AM 08:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### NORTHWESTERN DIVISION

| | |
|---|---|
| **ROSE BAUER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | ) **Civil Action No. 3:15-CV-348-CLS** |
| | ) |
| **THE TRAVELERS HOME AND** | ) |
| **MARINE INSURANCE CO.,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Rose Bauer, commenced this action in the Circuit Court of Lauderdale County, Alabama, asserting claims of breach of contract and bad faith against The Travelers Home and Marine Insurance Company ("Travelers"), which had issued a homeowners insurance policy to plaintiff.[1]  Travelers denied a claim for property damages caused by vandalism to plaintiff's home, and awarded plaintiff only a limited amount for loss of personal property due to theft, asserting that plaintiff's extended vacancy of the home had rendered her ineligible for coverage under the policy.  Travelers filed a timely removal of the case, asserting federal jurisdiction based upon satisfaction of the requirements of the diversity statute, 28 U.S.C. §1332(a).[2]  The controversy now is before the court on Travelers' motion for

---

[1] *See* doc. no. 1-1 (Complaint).

[2] Doc. no. 1 (Notice of Removal).  Plaintiff stated in her complaint that she is a resident of

summary judgment,[3] and Travelers' motion to strike the affidavit submitted by plaintiff in opposition to summary judgment.[4]  Upon consideration of the motions, briefs, and evidentiary submissions, the court concludes that the motion to strike should be granted, but only in part, and that the motion for summary judgment should be granted in its entirety.

## I. MOTION TO STRIKE

Travelers requests the court to strike the affidavit plaintiff submitted in support of her response to Travelers' motion for summary judgment.[5]  Without question, plaintiff's summary judgment response failed to comply with the Uniform Initial Order, which requires parties opposing summary judgment to set forth their objections to the moving party's claimed undisputed facts, and their own proposed disputed and undisputed facts, in separately numbered paragraphs, and to provide precise record citations to support each disputed and proposed fact.[6]  Moreover,

---

Alabama, and Travelers is a Connecticut corporation with its principal place of business in Connecticut.  *Id.* at 2, ¶¶ IV-V.  The court notes that whether plaintiff actually is a resident of Alabama or California is an issue int his case.  In any event, plaintiff is not a resident of Connecticut, so the parties are of diverse citizenship.  Additionally, although plaintiff did not make a claim for a specific amount of damages in her complaint, it is apparent from a review of her complaint that, if she prevailed, her damages could easily exceed the jurisdictional minimum of $75,000. *See id.* at 2-6, ¶ 7.

[3] Doc. no. 53.

[4] Doc. no. 65.

[5] *See* doc. no. 65 (Motion to Strike), doc. no. 61-1 (Affidavit of Rose Bauer).

[6] *See* doc. no. 4 (Uniform Initial Order), at 15-16.

plaintiff's brief consists of only four pages,[7] but her attached affidavit, which contains most of her factual contentions and legal arguments, is forty-six pages long.[8] Together, the two documents exceed the thirty-page limit for summary judgment response briefs.[9] Even so, plaintiff unnecessarily added to the length of her affidavit by employing wide page margins and retyping each of defendant's proffered facts. Without those superfluous additions, plaintiff's submission likely would have fallen within the page limitation. For that reason, the court concludes that it will be more efficient to accept plaintiff's submission, despite its non-compliance with the Uniform Initial Order, than to require plaintiff's attorney to re-format the submission. The court also does not find it necessary to address every objection raised by defendant. To do so would take more pages than addressing the merits of plaintiff's claims. In addition, the court simply will disregard affidavit statements that are conclusory, hearsay, speculation, not within plaintiff's personal knowledge, or improper opinion testimony. Such statements will not be stricken, but they will not be considered in ruling on defendant's motion for summary judgment.

Instead, the only objections that need to be addressed in any detail are those based upon inconsistencies between plaintiff's deposition and affidavit testimony.

---

[7] Doc. no. 61 (Plaintiff's Opposition to Summary Judgment).

[8] *See* doc. no. 61-1 (Affidavit of Rose Bauer).

[9] *See* doc. no. 4 (Uniform Initial Order), at 13 ("Initial and response briefs are limited to thirty pages.").

To support such objections, Travelers has invoked the "sham affidavit" rule, which provides that a court

> may determine that an affidavit is a sham when it contradicts previous deposition testimony and the party submitting the affidavit does not give any valid explanation for the contradiction.  *See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656 (11th Cir. 1984). However, "[t]his rule is applied sparingly because of the harsh effect it may have on a party's case." *Allen v. Bd. of Pub. Educ. for Bibb County*, 495 F.3d 1306, 1316 (11th Cir. 2007).  As such, courts must "find some inherent inconsistency between an affidavit and a deposition before disregarding the affidavit." *Id.*

*Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1237 (11th Cir. 2010) (alteration in original).

The first portion of plaintiff's affidavit challenged by Travelers is a response to Travelers' statement that "[p]laintiff lived in a rental house in Los Angeles from October 2013 to the present."[10]  Plaintiff stated that she "did not rent the Los Angeles house.  Rather, I assisted my friend, the Los Angeles homeowner, in getting out of foreclosure, in exchange for accommodating myself and my dogs.  The cost was approximately the same."[11]  Travelers asserts that those statements contradict the following passages from plaintiff's previous deposition testimony:

> Q.  Okay.  All right.  We are going to go through these in detail.
> I just wanted to make sure that we're on the same page —

---

[10] Doc. no. 54 (Travelers' Brief in Support of Motion for Summary Judgment), at ECF 5, ¶ 9 (alteration supplied).

[11] Doc. no. 61-1 (Affidavit of Rose Bauer), at 9.

A.  Right.

Q.  — but these are your documents in support of your damages in this case?

A.  Yes.

Q.  With the understanding, as you explained previously, that you are still living in the home in California and so therefore *you still are incurring rent every month* —

A.  *Yes*.

Q.  — correct?  All right.  What I want to do before we go through these documents is cover some other things, okay?  But we will talk about these because I want to understand what you've given us here today.

A.  Okay.

Q.  Now, based on the discovery responses that you've previously given us and filed in the case, it is my understanding that you are currently residing at this [redacted] address?

A.  Yes.

Q.  And, again, that's [redacted] in Los Angeles?

A.  Yes.

Q.  *Now, who is Barbara S. Brody*?

A.  She is the elderly lady *that I rent from*.

Q.  How long have you lived at [redacted] Avenue?

A.  I moved from [redacted] to there [during] October of 2013.

5

Doc. no. 55-5 (Deposition of Rosalee Stella Bauer), at 45-46 (alterations and emphasis supplied).  Plaintiff also testified that she had paid $2,100 a month in rent for the California property since October 1, 2013.[12]  Finally, she testified that she sometimes mailed her rent checks to the conservator who manages the estate of Ms. Barbara S. Brody, *and sometimes mailed them directly to Ms. Brody's mortgage company.*[13]

Plaintiff's affidavit testimony that she did not rent the home in Los Angeles is inherently contradictory to her testimony that she did rent the home.  Simply because plaintiff sometimes made her payments directly to her landlord's mortgage company does not change the nature of the rental agreement.  The challenged statements will be stricken from plaintiff's affidavit.

The other portions of plaintiff's affidavit challenged by Travelers all relate to the contents that remained in plaintiff's Florence, Alabama home after she moved to California. The first contested statements are found in the following passages:

> After closing my art and antiques gallery in Florence, Alabama, in 2008, I brought many pieces of high-quality antique furniture from my gallery to my home.  However, before departing for California, when I needed to raise funds for my business travel, my dear friend Judy Sizemore offered to purchase my high-quality 8-seater mahogany dining room set. I, who am in the business of buying and selling furniture incessantly,

---

[12] Doc. no. 55-5 (Deposition of Rosalee Stella Bauer), at 49.

[13] *Id.* at 53-54.

often acquire or sell furniture, sometimes including personal furniture. Ms. Sizemore additionally purchased a few other items of furniture (a sofa and chairs) from me for Ms. Sizemore and for her son's home at that time.  Nonetheless, I continued to maintain personal property, furniture, and other contents of my home in my home after departing for destinations including California, and all of that personal property, furniture, and other contents remained in my home in Florence, Alabama until January 28, 2013, when my Florence home was burglarized, resulting in the theft of many items of personal property, furniture, and other contents of my home.  Travelers recognized this and paid me $18,749.16 for some of it.

Doc. no. 61-2 (Affidavit of Rose Bauer), at ECF 5.

Plaintiff also made the following statements in response to Travelers' assertion

that, "[i]n August 2012, Ms. [Carmen] Erdmann [plaintiff's neighbor] and Mr. [Clint]

Pittman [a potential renter] walked through [plaintiff's Florence] house and noted

only a few items of furniture and that the house contained no toiletries or linens":[14]

Disputed that there were "only a few items of furniture" to be seen and that there were no linens to be seen.  Just prior to this period of my medical convalescence, Deborah Ford Rogers had lived in my house for many months.  I do not know one way or another whether or not Deborah replenished the toiletries before departing the house.  I do know Deborah used my towels and linens while staying there.  Ms. Erdman had not been present in my house for several years prior to her visit that day with Mr. Pittman. (Ms. Erdman did not know how much or little furniture I normally maintained in my home in this period or in other periods.)  I submit that present in the house were my queen-size bed, my multimedia entertainment center (including television set), my antique chest of drawers, my chairs, my writing desk, office furniture, dishes, silverware, a very large refrigerator in the kitchen, a gourmet gas

---

[14] Doc. no. 54 (Travelers' Brief in Support of Motion for Summary Judgment), at ECF 7, ¶ 23 (alterations supplied).

stove, pots and pans, and other items of personal furniture, domestic furnishings, culinary equipment, and pieces of framed artwork and art-quality framed photographs.  Nonetheless, . . . I freely concede that I had sold some personal furniture (particularly the dining room set) to my friend Judy Sizemore, as well as items of surplus furniture.  It is not very surprising if the lack of a dining room set was noticed by visitors unfamiliar with my recent financial straits.

Doc. no. 61-2 (Affidavit of Rose Bauer), at ECF 7 (ellipsis supplied).  Travelers asserts that plaintiff's affidavit testimony is inconsistent with both her prior deposition testimony, and the sworn "Examination Under Oath" to which she submitted during the claims investigation process.

During her Examination Under Oath, plaintiff was asked why she stored jewelry in a box in her closet when she left for California if she was not planning to be away from home for very long.  She responded:

> A. Because I was living in the den in the cottage room, and all the other rooms, the back room was empty.  Nothing was there.  Nothing was left.  Judy bought most of the living room stuff.

> Q. Okay.

> A. So I was pretty much selling everything.

> Q. For income?

> A. I needed to make some money.  I was being foreclosed.

> Q. I was just confirming.

> A.  And Judy can take pictures.  I hated that I had to sell my

dining room table.  I know somewhere I'll show you.  It went from my house to Judy's house, all my lamps, everything.  But she was the only one who was willing to buy it.  And I think sometimes she brought [*sic*] it just to help me.

Q.  So because you were just living basically in one room, you decided to box items up and store them in a closet?

A.  Okay.  My house costs a fortune to heat.  Imagine I can't sell anything.  I'm getting sick.  The only way I can do anything is to try to get some of the antiques back to LA now.  That was the only hope, otherwise I would have nothing.

Q.  Okay.

A.  So if I stayed in the two side rooms — like I stayed in the den — the den and the little cottage room and one little bathroom, I could keep those rooms warm because I had those little heaters.  If I used the big heater, it was like $600 a month and I didn't have it.

Q.  Okay.

A.  So eventually they were going to turn me off because I couldn't afford it.

Q.  So you were using like little space heaters in those smaller rooms?

A.  Yes.  It was great because I had the den, the sofa.  She bought all the living room sofa and all of that.

Q.  Who did?

A.  Judy.

Q.  Judy bought all of that?

9

A.  You can see all of that.  She can send us pictures.  She bought that.  The living room and dining room was huge [*sic*], and the living room also had these huge French doors.  There was all this air.  It was just so hard to keep — so I just — that is how I did it.  It was the smartest thing for me to do, to consolidate.

Q.  So when you left the home in February 2012, essentially the only rooms that were still set up were the den?

A.  Yes. Except I did have the entertainment — Deborah at one point stayed in my cottage room but she had her own TV.  But I did then put the big TV back into the living room.

Q.  What do you call the cottage room?  I don't understand.

A.  That was a little bedroom by the den in the middle of the house.

Q.  Not your bedroom?

A.  That was — I made that my bedroom because I kept the den — there was a little cottage room, a bathroom and den.

Q.  Okay.

A.  I just kind of — that became more of how I consolidated.

Q.  You just sort of packed up everything else in the attic?

A.  I sold everything I could.

Q.  You sold —

A.  I sold tons of things.

Doc. no. 55-4 (Examination Under Oath of Rose Bauer), at 315-18.  During plaintiff's

deposition, she confirmed that she "had essentially sold all of [her] items except for what [she] had in the cottage room."[15]

The court does not find any inherent inconsistencies in plaintiff's testimony. Even though plaintiff testified during her examination that she sold many of her personal items, she never stated that she sold *everything* she owned.  In fact, she testified that there were still items remaining in her "cottage room."  That is not inconsistent with her subsequent affidavit testimony that she retained a bed, entertainment center, chest of drawers, chairs, writing desk, and office furniture, along with other decorative items, or that she maintained "personal property, furniture, and other contents" in her Florence, Alabama home.  There is no need to strike this portion of plaintiff's affidavit.

## II. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will

---

[15] Doc. no. 55-5 (Deposition of Rosalee Stella Bauer), at 246 (alterations supplied).

bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

"In making this determination, the court must review all evidence and make all

reasonable inferences in favor of the party opposing summary judgment." *Chapman

v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v.

City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).   Inferences in favor of the non-

moving party are not unqualified, however.  "[A]n inference is not reasonable if it is

'only a guess or a possibility,' for such an inference is not based on the evidence, but

is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d

1321, 1324 (11th Cir. 1983) (alteration supplied).   Moreover,

> [t]he mere existence of some factual dispute will not defeat summary
> judgment unless that factual dispute is *material* to an issue affecting the
> outcome of the case.   The relevant rules of substantive law dictate the
> materiality of a disputed fact.   A genuine issue of material fact does not
> exist unless there is sufficient evidence favoring the nonmoving party
> for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration

supplied).   *See also Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 251-52 (1986)

(asking "whether the evidence presents a sufficient disagreement to require

submission to a jury or whether it is so one-sided that one party must prevail as a

matter of law").

### III. SUMMARY OF FACTS

12

A.      **Plaintiff's Policy with Travelers**

Travelers issued a Homeowners Policy insuring plaintiff's Florence, Alabama residence on July 24, 2008 ("the policy").[16]  The policy subsequently was renewed for several one-year periods, the final one of which covered  the period beginning on July 24, 2012, and extending through the same date in the following year, 2013.[17]  Plaintiff received a copy of the policy and had an opportunity to review it.[18]

The policy provides coverage for "[t]he dwelling on the 'residence premises' shown in the Declarations, including structures attached to the dwelling."[19]  The policy defines "residence premises" as "[t]he one family dwelling where you reside . . . and which is shown as the 'residence premises' in the Declarations."[20]  The Declarations page of the policy identified the "residence premises" as a specific address in Florence, Alabama, which plaintiff does not dispute is the address of the home that is the subject of her claim.[21]

If damage to the dwelling made "that part of the 'residence premises' where

---

[16] Doc. no. 55-31, at ECF 12 (Homeowners Policy New Business Declarations).

[17] Doc. no. 55-21, at ECF 2 (Homeowners Policy Continuation Declarations).

[18] Doc. no. 55-5 (Deposition of Rosalee Stella Bauer), at 123.

[19] Doc. no. 55-21, at ECF 21 (Homeowners Policy Booklet, § I(A)(1)(a)) (alteration supplied).

[20] *Id.* at ECF 21 (Homeowners Policy Booklet, § 13) (alteration supplied).

[21] Doc. no. 55-21, at ECF 2 (Homeowners Policy Continuation Declarations).  The actual address of the property is redacted from the copy of the declarations page in the record.

[the insured] reside[s] not fit to live in," then the policy also covered "any necessary increase in living expenses incurred by you so that your household can maintain its normal standard of living."[22]

The policy also provided coverage for personal "property owned or used by an 'insured' while it is anywhere in the world."[23]  However, there are limits on the coverage available for certain categories of personal property, including a $1,500 limit "for loss by theft of jewelry, watches, furs, precious and semiprecious stones."[24] Personal property losses would be compensated "at actual cash value at the time of loss but not more than the amount required to repair or replace."[25]

Certain exclusions to coverage applied.  Coverage was not provided for damage to a structure or for a loss caused by:

(4)  Vandalism and malicious mischief, and any ensuing loss caused by any intentional and wrongful act committed in the course of the vandalism or malicious mischief, *if the dwelling has been vacant for more than 60 consecutive days immediately before the loss.  Vacant means substantially empty of personal property necessary to sustain normal occupancy*.  A dwelling being constructed is not considered vacant;

(5)  Constant or repeated seepage or leakage of water or steam, or the presence or condensation of humidity, moisture or vapor, that occurs

---

[22]  *Id.* at ECF 20 (Homeowners Policy Booklet, § I(D)(1)) (alterations supplied).

[23]  *Id.* at ECF 18 (Homeowners Policy Booklet, § I(C)(1)).

[24]  *Id.* at ECF 19 (Homeowners Policy Booklet, § I(C)(3)(e)).

[25]  *Id.* (Homeowners Policy Booklet, § I(3)(a)(1)).

over a period of 14 days or more; or

      (6)  Any of the following:

            (a)  Wear and tear, marring, deterioration . . . .

Doc. no. 55-21, at ECF 25 (Homeowners Policy Booklet, § I(A)(2)(c)(4)-(6)) (emphasis supplied).

The policy also excluded losses caused by the neglect of an insured, which was defined as a failure "to use all reasonable means to save and preserve property at and after the time of a loss."[26]  Finally, the policy excluded losses caused by:

Faulty, inadequate, or defective:

a.     Planning, zoning, development, surveying, siting;

b.     Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

c.     Materials used in repair, construction, renovation or remodeling; or

d.     Maintenance.

*Id.* at ECF 29 (Homeowners Policy Booklet, § I(B)(3)).

A condition of *any* coverage under the policy was stated as follows:  "The coverage provided and the premium charged are based on information you have given us. *You agree to* cooperate with us in determining if this information is correct and

---

[26] *Id.* at ECF 28 (Homeowners Policy Booklet, § I(A)(5)).

complete and to *inform us of any change in* title, use or *occupancy of the 'residence premises.'*"[27]  No legal action could be brought against Travelers under the policy "unless there has been full compliance with all of terms [*sic*] under Section I of this policy and the action is brought within the time limitations prescribed by Alabama law."[28]

## B.    Plaintiff's Occupancy of the Insured Property

Plaintiff purchased and moved into her home in Florence, Alabama during 2003.[29]  The municipal utility company, Florence Utilities, disconnected all of plaintiff's utilities in March of 2011, while she was traveling for business, due to her non-payment of monthly utility bills.[30]  The utilities remained disconnected until August 19, 2011, when plaintiff decided to allow her friend Deborah Ford Rogers to stay at her home.[31]  Plaintiff did not charge Ms. Rogers any rent; she only required her to pay the utilities.[32]  Even so, Florence Utilities required proof of Ms. Rogers' residency before they would transfer the utilities to Ms. Rogers' name, so plaintiff

---

[27] Doc. no. 55-21, at ECF 39 (Homeowners Policy Booklet, § I-II(2)) (alteration and emphasis supplied).

[28] *Id.* at ECF 11 (Homeowners Policy Booklet, § I(9)).

[29] Doc. no. 55-4 (Examination Under Oath of Rose Bauer), at 101, 103.

[30] Doc. no. 55-25 (Affidavit of Kathy Anderson), at ¶¶ 3-4.

[31] *Id.* at ¶¶ 5, 8; doc. no. 61-2 (Affidavit of Rose Bauer), at ECF 1-2, Response to Statement 14.

[32] Doc. no. 55-4 (Examination Under Oath of Rose Bauer), at 88-90.

and Ms. Rogers executed a rental agreement stating that Ms. Rogers was leasing the property from plaintiff at a rate of $1,200 per month for a one-year period beginning on August 15, 2011.[33]  Plaintiff attested that the lease agreement was a  "mere 'red tape' formal necessity with the understanding with Deborah [that it was] in fact not contractually binding in any way between us [as] two longstanding friends."[34]  Ms. Rogers moved out of plaintiff's home in January or February of the following year, but she continued making utility payments until April 3, 2012.  On that date, all of the utilities to the house were, once again, disconnected.[35]

During the early part of 2012, plaintiff sold many of the personal items in her Florence home in order to generate income.  She retained a sofa, television set, stereo system, entertainment center, bed, dresser, stove, oven, refrigerator, dishwasher, some small kitchen appliances, and some artwork.  To conserve energy and decrease her heating costs, she closed off some of the rooms and began living in a bedroom by the den in the middle of the house.  She called the bedroom her "cottage room."[36]

Plaintiff departed Florence in late February 2012, and drove to California on

---

[33] Doc. no. 55-17 (Rental Agreement).  *See also* doc. no. 55-5 (Deposition of Rosalee Stella Bauer), at 217-18.

[34] Doc. no. 61-2 (Affidavit of Rose Bauer), at ECF 2 (alterations supplied).

[35] Doc. no. 55-13 (Deposition of Deborah Ford Rogers), at 39; doc. no. 55-4 (Examination Under Oath of Rose Bauer), at 89-93; doc. no. 55-24 (Affidavit of Kathy Anderson), at ¶ 8.

[36] Doc. no. 55-4 (Examination Under Oath of Rose Bauer), at 221, 315-18; doc. no. 55-5 (Deposition of Rosalee Stella Bauer), at 246; doc. no. 61-2 (Affidavit of Rose Bauer), at ECF 5, Response to Statement 21.

a business trip for the purpose of selling antiques.  After making several stops along the way to visit family, she arrived in early March 2012 at the home of her friends Wendy McKenzie and Gary Austin in Valley Village, California.[37]  Plaintiff initially planned for her stay to last approximately six weeks, but she suffered a ruptured appendix and required emergency surgery on April 8, 2012, while still in California.[38]  She spent the remainder of 2012 convalescing at the McKenzie/Austin residence because she was unable to drive back to Alabama.[39]  She initially planned to return to Alabama in December of 2012, but her friends and family in California convinced her to stay there through the holiday season.[40]  Plaintiff testified that her neighbor Tom Matthews regularly checked on her Florence, Alabama property while she was away, but the record does not contain any testimony from Mr.  Matthews himself.[41]

Plaintiff applied for and received medical benefits and food stamps from the State of California's "Medi-Cal" program during April of 2012.[42]  She also opened

---

[37] Doc. no. 55-4 (Examination Under Oath of Rose Bauer), at 25-26, 28-30, 105-06; doc. no. 61-1 (Affidavit of Rose Bauer), at 5, Response to Statement 5.

[38] Doc. no. 55-4 (Examination Under Oath of Rose Bauer), at 25-26; doc. no. 61-1 (Affidavit of Rose Bauer), at 5, Response to Statement 5.

[39] Doc. no. 55-4 (Examination Under Oath of Rose Bauer), at 25-30; doc. no. 61-1 (Affidavit of Rose Bauer), at ECF 5, Response to Statement 5.

[40] Doc. no. 55-4 (Examination Under Oath of Rose Bauer), at 124-25.

[41] *Id.* at 79-80; doc. no. 55-5 (Deposition of Rosalee Stella Bauer), at 236; doc. no. 61-1 (Affidavit of Rose Bauer), at ECF 8, Response to Statement 7; doc. no. 61-4 (Affidavit of Rose Bauer), at ECF 3-4, Response to Statement 48.

[42] Doc. no. 55-4 (Examination Under Oath of Rose Bauer), at 66, 350-51; doc. no. 55-5 (Deposition of Rosalee Stella Bauer), at 197-200; doc. no. 61-1 (Affidavit of Rose Bauer), at ECF

a checking account at a California bank during July of 2012, in order to fund the costs of a film production project on which she wanted to resume work.[43]  She did not actually resume work on that project during the summer of 2012, however.  Thus, "the checking account had essentially no activity, and the account was automatically closed by the bank some months later."[44]

Plaintiff's friend Judy Sizemore, who resided in Florence, Alabama, suggested to plaintiff in August of 2012 that she rent the upstairs loft room of her house to a man named Clint Pittman, who might be willing to perform some repairs to the home. Plaintiff was experiencing financial difficulty during her convalescence. Consequently, she and Ms. Sizemore discussed the potential arrangement with Mr. Pittman.  Plaintiff asked her neighbor Carmen Erdmann, who had a key to the house, to show Mr. Pittman the property.[45]  Ms. Erdmann and Mr. Pittman walked through the property during August 2012.[46]  Ms. Erdmann testified that the house was in "disarray," with broken pipes, exterior doors left open, and old food on the

---

10, Response to Statement 10.

[43] Doc. no. 55-6 (Continuation of Deposition of Rose Bauer), at 95-96; doc. no. 61-2 (Affidavit of Rose Bauer), at ECF 1, Response to Statement 13.

[44] Doc. no. 61-2 (Affidavit of Rose Bauer), at ECF 1, Response to Statement 13.

[45] Doc. no. 55-4 (Examination Under Oath of Rose Bauer), at 177, 182, 203; doc. no. 55-5 (Deposition of Rosalee Stella Bauer), at 223; doc. no. 55-12 (Deposition of Carmen Erdmann), at 19-25; doc. no. 55-14 (Deposition of Clint Pittman), at 18-24; doc. no. 61-2 (Affidavit of Rose Bauer), at ECF 6, Response to Statement 22.

[46] Doc. no. 55-12 (Deposition of Carmen Erdmann), at 17.

countertops and in the refrigerator.[47]   According to Ms. Erdmann, The house contained "minimal furniture, if any."[48]   There was an armoire in the main living room; a stove, refrigerator, and "miscellaneous kitchen items" in the kitchen; a bed and other personal items in a back bedroom; and a large movie poster in either the living room or dining room.[49] Ms. Erdmann testified that she observed a sleeping bag in the first bedroom, so she deduced that there were no bed linens in the house.[50] She also noticed shingles missing from the roof.[51]  Mr. Pittman testified that the house was "in total discord" and "completely trashed out."[52]  He observed old food and animal droppings in the kitchen.[53]  There was no furniture in the foyer, hallway, or dining room, a television cabinet in the living room, a non-functioning stove and refrigerator in the kitchen, a washer and dryer on the back porch, and a restaurant-style table and chairs in a bedroom.  Mr. Pittman observed no toiletries or linens stocked in the house, and utilities were disconnected.[54]  There was a hole in the porch screen, the valleys of the roof were full of debris, and there was a hole in the roof near

---

[47] *Id.* at 29-30.

[48] *Id.* at 34.

[49] *Id.* at 30, 34.

[50] *Id.* at 49.

[51] *Id.* at 63.

[52] Doc. no. 55-14 (Deposition of Clint Pittman), at 30.

[53] *Id.*

[54] *Id.* at 30-37.

the front door that was causing a leak.[55]

Plaintiff disputes Ms. Erdmann's assertion that there was only "minimal furniture" in the home, and attests that, on the date Ms. Erdmann and Mr. Pittman walked through the house, it contained plaintiff's

> queen-size bed, . . . multimedia entertainment Center (including television set), . . . antique chest of drawers, . . . chairs, . . . writing desk, office furniture, dishes, silverware, a very large refrigerator in the kitchen, a gourmet gas stove, pots and pans, and other items of personal furniture, domestic furnishings, culinary equipment, and pieces of framed artwork and art-quality framed photographs.

Doc. no. 61-2 (Affidavit of Rose Bauer), at ECF 7, Response to Statement 23 (ellipses supplied).  She also asserts that her roof was damaged in a hail storm that occurred after she left town in February of 2012.[56]

Plaintiff drafted a Rental Contract dated September 1, 2012, and stating that Clint Pittman agreed to lease the property for a fixed term beginning on that date and ending on February 30, 2014, with an option to convert to a month-to-month lease at the end of the term.  The contract required a security deposit of $300, and it specified a monthly rent of $1,000, which included a $400 discount for "Tenant agreeing to do all repairs, clean interior and exterior of the home, replace water heater, heating and

---

[55] *Id.* at 50, 52.

[56] Doc. no. 61-2 (Affidavit of Rose Bauer), at ECF 8-9, Response to Statement 24; doc. no. 61-3 (Affidavit of Rose Bauer), at ECF 1, Response to Statement 24.  As discussed on page 28, *infra*, plaintiff is not seeking to recover for the damage to her roof.

ac unit, maintaining the grounds and over seeing [*sic*] the care and feeding of two black labrador retrievers that live on the property."[57]   The contract also stated that plaintiff had the right to terminate the agreement after one year if she decided to move back into or sell the property, and it contained a handwritten addition signed by plaintiff, dated September 11, 2012, and stating:  "If I choose to sell my home in two years or less, Clint Pittman will have first position to make an offer."[58]  This court's record only contains one copy of the rental contract.  That copy contains plaintiff's typed name and the date of "9/1/2012."  Other than the handwritten addition noted above, however, the copy does not contain the signature of either plaintiff or Mr. Pittman.[59]  Even so, Carmen Erdmann testified that she saw Mr. Pittman sign a copy of the contract.[60]  Mr. Pittman testified that, even though he never possessed or saw a copy of the contract that contained both his signature and plaintiff's, he thought that he had a copy that bore plaintiff's signature, and she had a copy that bore his signature.[61]

Plaintiff never informed Travelers that she had entered into a rental agreement

---

[57] Doc. no. 55-18 (Rental Contract), at ECF 2.  *See also* doc. no. 55-4 (Examination Under Oath of Rose Bauer), at 177-78; doc. no. 55-12 (Deposition of Carmen Erdmann), at 59, 67-69; doc. no. 55-14 (Deposition of Clint Pittman), at 25, 29, 37.

[58] Doc. no. 55-18 (Rental Contract), at ECF 3.

[59] *See id.*  The handwritten addition dated September 11, 2012 is accompanied by plaintiff's signature, but the original contract, dated September 1, 2012, does not.

[60] Doc. no. 55-12 (Deposition of Carmen Erdmann), at 67.

[61] Doc. no. 55-14 (Deposition of Clint Pittman), at 28-29.

with Mr. Pittman, or that Mr. Pittman would be staying in and performing repairs to her home.[62]

In fact, however, Mr. Pittman never moved into plaintiff's home, but he did obtain a key from Ms. Erdmann, and he began cleaning the property, both inside and out.[63]  Without plaintiff's authorization, Mr. Pittman attempted to have the utilities reconnected, but the attempt caused a small fire at the electrical box, and no further attempts were made.[64]  At the direction of the City of Florence electrical inspector, the electrical meter for the property was removed on September 18, 2012, and all the utilities have remained disconnected since that date, except that the water service was reconnected on October 20, 2015.[65]  Plaintiff subsequently had the locks to the house changed and, as a consequence, Mr. Pittman could not use the key he had been provided to gain access.[66]

Plaintiff still resides in the Los Angeles, California area.[67]  She attests that she remained in California through January 28, 2013, because of her convalescence and

---

[62] Doc. no. 55-5 (Deposition of Rosalee Stella Bauer), at 223-25.

[63] Doc. no. 55-12 (Deposition of Carmen Erdmann), at 90; doc. no. 55-14 (Deposition of Clint Pittman), at 42, 46-49.

[64] Doc. no. 55-14 (Deposition of Clint Pittman), at 37, 44; doc. no. 61-3 (Affidavit of Rose Bauer), at ECF 4, Response to Statement 29.

[65] Doc. no. 55-24 (Affidavit of Kathy Anderson), at ¶¶ 11-12.  *See also* doc. no. 55-14 (Deposition of Clint Pittman), at 43-44.

[66] Doc. no. 61-3 (Affidavit of Rose Bauer), at ECF 5-6, Response to Statement 31.

[67] Doc. no. 55-4 (Examination Under Oath of Rose Bauer), at 103.

23

holiday plans, and that she continued to stay in California after the theft because her Florence, Alabama home was rendered uninhabitable, and, without insurance proceeds, she lacks the funds to restore it.[68]  She stayed in the home of Wendy McKenzie and Gary Austin in Valley Village, California, until October of 2013.[69] Since October 2013, she has been residing in the Los Angeles home of an elderly friend who had to move to a nursing home facility.  Plaintiff pays $2,100 per month to stay in that home, plus the cost of utilities.  Sometimes plaintiff makes the payment to the conservator of her friend's estate, and sometimes she makes it directly to her friend's mortgage company, to cover the cost of her friend's mortgage.[70]

## C.    The January 28, 2013 Theft and Subsequent Investigation

Carmen Erdmann observed individuals breaking into, taking items from, and vandalizing plaintiff's home on January 28, 2013.  She notified both the Florence police and plaintiff, who still was in California.[71]  Plaintiff reported the break-in to Travelers on February 1, 2013, stating that the thieves had stripped some copper pipes from the walls and taken her air conditioning unit, stainless steel stove, refrigerator

---

[68] Doc. no. 61-1 (Affidavit of Rose Bauer), at ECF 8, Response to Statement 7.

[69] Doc. no. 55-5 (Deposition of Rosalee Stella Bauer), at 47.

[70] Id. at 44-54.

[71] Doc. no. 55-12 (Deposition of Carmen Erdmann), at 74-84; doc. no. 55-4 (Examination Under Oath of Rose Bauer), at 195-200, 208.

doors, and jewelry.[72]   Travelers conducted its first inspection of the property on February 14, 2013, because plaintiff was not able to travel back to Alabama from California until that date.[73]   Travelers learned during the initial inspection that plaintiff had not stayed at the house since March of 2012, and that the utilities had been disconnected since April of 2012.[74]   Travelers agreed to pay plaintiff's "Alternative Living Expenses," including hotel accommodations, for the period February 13 to 16, 2013, when she was in Florence for the investigation, but it declined to pay any additional Alternative Living Expenses.[75]

Travelers conducted a second inspection of the property on March 10, 2013, and a portion of that inspection report stated:

> Inspection revealed deteriorated shingles that are in poor condition.  Shingles are twenty year three tab that appear to be twenty years or older.  Deteriorated pipe boots and exhaust vents were noted.  Visible rot to dormer window and rear section of dwelling.  Chimney mortar deteriorated.  Valleys clogged with debris.  Interior damages consist of mold throughout dwelling.  A portion of the upstairs ceiling had collapsed from what appears to be water entering through deteriorated exhaust vent.  A hole was noted to left side of dwelling roof but is not consistent with the interior water damage to ceiling upstairs.  Contractor agreed.  Wiring had been cut in several places.  Motors to units inside were not taken nor was the cooper lines leading to exterior HVAC units.  Some wiring in basement was cut but the wiring appears

---

[72] Doc. no. 55-2 (Travelers Claim File), at ECF 2-4.

[73] *Id.* at ECF 3-6.

[74] *Id.* at ECF 5-8.

[75] Doc. no. 55-2 (Travelers Claim File), at ECF 3-8.

to be from discontinued junction boxes that were no longer in use. There was no sign of damaged wiring to the updated/newer electric service. Doors to refrigerator missing[;] bed frame in bedroom and desk in office along with boxes of contents upstairs. There were also contents stored in shed #2[.] The outside HVAC units that were reported stolen in HPG8680 was noted that the two exterior breaker boxes did not have the fuse pulled or the breaker cut off disengaged. Both boxes were in the on position.

Doc. no. 55-3 (Travelers Claim File), at ECF 4-5 (alterations supplied).

John Carroll, an investigator from Travelers Investigative Services, also conducted an investigation of plaintiff's claim during early and mid-March of 2013. Mr. Carroll looked into plaintiff's financial status, including any prior lawsuits, judgments, or liens against her, and the status of her mortgage.[76]

## D.   Travelers' Decisions

Travelers mailed a letter to plaintiff on May 20, 2013, informing her that her claim for damage to her property due to vandalism and theft was denied because she had not been using the property as her residence, and because the property had been vacant for more than sixty days prior to the theft.[77] Travelers continued to investigate plaintiff's claim for loss of personal property, however,[78] and plaintiff submitted to

---

[76] Doc. no. 55-25 (Affidavit of John Carroll), at ¶¶ 1, 6-7.

[77] Doc. no. 55-29 (May 20, 2013 letter denying coverage for property damage due to vandalism and theft). Travelers also sent another letter the same day, denying coverage on plaintiff's claim for roof damage. *See* doc. no. 55-30 (May 20, 2013 letter denying coverage for roof damage). Because plaintiff has abandoned her claim for roof damage recovery, it is not necessary to discuss that letter. *See infra,* page 28.

[78] *See* doc. no. 55-29 (May 20, 2013 letter denying coverage for property damage due to

an examination under oath on January 16, 2014.[79]  Travelers also agreed to reopen

plaintiff's claim for property damage while it continued to investigate the personal

property claim.[80]

Travelers mailed another letter to plaintiff a letter on May 21, 2014, informing

her that it would grant coverage for lost personal property in the amount of

$18,749.16.[81]  Travelers estimated that plaintiff would be entitled to an additional

$10,088.19 in deprecation upon replacement of her lost items, but plaintiff has not

replaced any of the items she lost in the theft.[82]  Plaintiff disputes that amount,

claiming instead that she should have been awarded $62,650.00.[83]  Travelers mailed

another letter to plaintiff on May 21, 2014, reaffirming its prior position that no

coverage was available for physical damage to the physical structure of her Florence,

Alabama house, because the property had not been plaintiff's "residence premises"

at the time of her loss.[84]

---

vandalism and theft), at ECF 2 ("The claim for personal property damage and/or theft is still being investigated at this time.").

[79]  *See* doc. no. 55-28 (January 16, 2014 letter informing plaintiff of January 22, 2014 examination under oath); doc. no. 55-4 (Examination Under Oath of Rose Bauer), at 1.

[80] *See* doc. no. 55-33 (May 14, 2014 letter reaffirming denial of coverage for property damage due to vandalism and theft), at ECF 1 ("After you requested that Travelers reconsider its coverage decision, Travelers agreed to reopen its investigation.").

[81]  Doc. no. 55-32 (May 2014 letter awarding coverage for loss of personal property).

[82]  Doc. no. 55-34 (Affidavit of Lynn Thornton), at ¶¶ 12-13.

[83]  Doc. no. 61-4 (Affidavit of Rose Bauer), at ECF 5, Response to Statement 51.

[84]  Doc. no. 55-33 (May 14, 2014 letter reaffirming denial of coverage for property damage due to vandalism and theft)

## IV. DISCUSSION

Plaintiff has withdrawn her bad faith claim, and her breach of contract claim related to coverage for roof and mold damage.[85]  Thus, the only remaining claims are the breach of contract claims related to coverage for property damage to the physical structure of plaintiff's property, and for loss of (and damage to) personal property.

"In order to establish a breach-of-contract claim, a plaintiff must show '(1) the existence of a valid contract binding the parties in the action, (2) [her] own performance under the contract, (3) the defendant's nonperformance, and (4) damages.'" *Ex parte Alfa Mutual Insurance Co.*, 799 So. 2d 957, 962 (Ala. 2001) (quoting *Southern Medical Health Systems, Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995)) (alteration supplied).

Plaintiff cannot demonstrate that Travelers failed to perform under the insurance contract.  Travelers was not required to cover the damages to the physical structure of plaintiff's house because the property was not plaintiff's "residence premises" at the time of the loss.  A dwelling house is not an insured's residence premises unless she resides in it, and plaintiff was not residing in her Florence, Alabama home when it was vandalized.  The policy does not define the term "reside," but a common, authoritative dictionary defines it as "to sit back, remain, abide"; "to

---

[85] Doc. no. 61 (Plaintiff's Opposition to Summary Judgment), at 2 ("The Plaintiff withdraws her claim for roof and mold damages."), 3 ("Plaintiff does not insist on her bad faith claim . . . .").

28

settle oneself or a thing in a place: be stationed:  REMAIN, STAY."  *Webster's Third New International Dictionary* 1931 (2002).[86]  When the burglary occurred in January of 2013, plaintiff was not remaining, abiding, or settling herself into her Florence, Alabama property.  In fact, she had not set foot in the property for almost a year.  Instead, because of her health problems, she had been residing in California since March of 2012, first at the home of friends, then at a home she rented.  She received medical and other benefits from the State of California, and she opened a checking account there.  In the meantime, she entered into an agreement for Clint Pittman to rent her Florence, Alabama home, even though he never moved into and occupied the dwelling.  She also kept the utilities to the property disconnected after April of 2012.  Those facts indicate that plaintiff was residing in California, and not Alabama, when her house was vandalized.

Plaintiff asserts that she retained residency in both Alabama and California.[87]  She relies upon the fact that her neighbor, Tom Matthews, looked after the property

---

[86] "General rules of contract law govern an insurance contract."  *Safeway Insurance Co. of Alabama v. Herrera*, 912 So. 2d 1140, 1143 (Ala. 2005) (citing *Twin City Fire Insurance Co. v. Alfa Mutual Insurance Co.*, 817 So. 2d 687, 691 (Ala. 2001)).  "If a word or phrase is not defined in the policy, then the court should construe the word or phrase according to the meaning a person of ordinary intelligence would reasonably give it."  *Safeway Insurance Co.*, 912 So. 2d at 1143 (citing *Twin City Fire Insurance Co.*, 817 So. 2d at 692).  In determining the common meaning of the terms of an insurance policy, [the Alabama Supreme Court] has looked to dictionary definitions."  *State Farm Fire & Casualty Co. v. Slade*, 747 So. 2d 293, 309 (Ala. 1999) (citing *Emergency Aid Insurance Co. v. Dobbs*, 263 Ala. 594, 83 So. 2d 335 (1955)) (alteration supplied).

[87] Doc. no. 61 (Plaintiff's Opposition to Summary Judgment), at 2 ("A person can live in two locations.").

while she was away.  That fact is not persuasive, because plaintiff likely would want a caretaker for an investment or rental property just as much as she would want one for her own residence.  In addition, and in reliance upon cases discussing jurisdiction and venue, plaintiff asserts that the term "residence" is the same thing as "domicile," which indicates a permanent, fixed home to which a person intends to return, and that her Florence, Alabama home was her *domicile* because she intended to return there after she recovered from her illness.  Plaintiff relies upon *Seymour v. Seymour*, 597 So. 2d 1368 (Ala. Civ. App. 1992), but that case is limited to the context of Alabama Code § 30-2-5, which discusses residency requirements for filing a divorce case in the Alabama state courts.[88]  *See Seymour*, 597 So. 2d at 1369 (*"For purposes of § 30-2-5*, residence is the same thing as domicile.") (emphasis supplied).  There is no indication that the Court of Civil Appeals' statement should be extended beyond that specific context.  In fact, the Alabama Supreme Court has explicitly stated that, outside the context of determining the appropriate venue for a case, "the terms 'residence' and 'domicile' are *not* considered synonymous."  *Ex parte Sides*, 594 So. 2d 93, 95 (Ala. 1992) (emphasis supplied).  In contrast, in the insurance context, courts have considered the term "residence" to be more closely tied to the place where

---

[88] That code section states:  "When the defendant is a nonresident, the other party to the marriage must have been a bona fide resident of this state for six months next before the filing of the complaint, which must be alleged in the complaint and proved." Ala. Code § 30-2-5.

a person is currently living than to the place where a person intends eventually to return and remain; *i.e.,* "domicile."  *See, e.g., Black's Law Dictionary* 558 (9th ed. 2009) (defining "domicile" as "[t]he place at which a person has been physically present and that the person regards as home; a person's true, fixed, principal, and permanent home, to which that person intends to return and remain even though currently residing elsewhere") (alteration supplied); *Morton v. Automobile Insurance Co. of Hartford, Conn.*, 102 F. Supp. 3d 1248, 1256 (N.D. Ala. 2015) ("Courts addressing substantially similar language [ *i.e.,* the "residence premises" requirement] under Alabama law have concluded that homeowners who rent their property but do not reside there are not covered.") (alteration supplied); *Country Casualty Insurance Co. v. Massey*, No. 3:09CV803-MEF, 2010 WL 5579881, at *4 (M.D. Ala. Dec. 20, 2010) (holding that an insured did not "reside" at a property when she did not live there at the time of the loss); *McGrath v. Allstate Insurance Co.*, 802 N.W.2d 619, 622-24 (Mich. Ct. App. 2010) (holding that an insured who was not living in the insured property at the time of the loss because of an extended illness, but who intended to return to the property, was not a "resident" of the property).

The Court of Appeals of Michigan concisely articulated the reasoning behind the residence requirement in a persuasive opinion, *McGrath v. Allstate Insurance Co.*, 802 N.W.2d 619 (Mich. Ct. App. 2010), in which the court stated that:

> The multiple risks assumed by an insurer in exchange for an insurance premium are tied to an understanding that the building structure covered is where the insured dwells either permanently or for a considerable period because the risks assumed are clearly affected by the presence of the insured in the dwelling and the associated activities stemming from this presence. Unoccupied or vacant homes, with no resident present to oversee security or maintenance, are at greater risk for break-ins, vandalism, fire, and water damage . . . .

*Id.* at 624. It stands to reason that the risk of vandalism to plaintiff's home increased as a result of her extended absence. And, indeed, vandalism did occur during her long absence. If Travelers had known that it was insuring the risk of damage to an unoccupied home, it likely would have charged plaintiff a higher premium.[89] The court understands that plaintiff's absence from her home was unexpected, and is sympathetic to the health issues she faced. Even so, there is no exception to the "residence premises" requirement for unexpected or illness-related absences — especially absences as lengthy as those involved in this case. Because the Florence, Alabama property was not plaintiff's residence premises at the time of the loss, she cannot recover for damages to the structure of that property itself.

The same reasoning applies to plaintiff's claim for additional living expenses.

---

[89] *See* doc. no. 55-21, at ECF 39 (Homeowners Policy Booklet, § I-II(2)) ("*The coverage provided and the premium charged are based on information you have given us.* You agree to cooperate with us in determining if this information is correct and complete and to inform us of any change in title, use or occupancy of the 'residence premises.' You agree that, if within 60 days of the policy effective date this information changes, is incorrect or incomplete, *we may adjust your coverage and premium accordingly* by giving you notice.") (emphasis supplied).

Plaintiff's entitlement to additional living expenses is only triggered if her "residence premises" are rendered "not fit to live in."[90]  Because the property was not plaintiff's residence premises, she is not entitled to receive additional living expenses.

Plaintiff's ability to recover for loss of her personal property requires a separate analysis.  The policy provides coverage for plaintiff's personal property "anywhere in the world,"[91] not just at (or within) the "residence premises."  Even so, a condition of *all* types of coverage under the policy is that the policy holder must "inform [Travelers] of any change in title, use or *occupancy* of the 'residence premises.'"[92] Plaintiff failed to notify Travelers that neither she nor anyone else was *occupying* the property after February of 2012.  Therefore, she is not entitled to *any* coverage under the policy, even coverage for loss to personal property.[93]

Even if plaintiff were entitled to coverage for her personal property, she has not submitted any proof that her damages should be more than the $18,749.16 amount that Travelers already has paid to her.  Thus, plaintiff has failed to present sufficient evidence regarding one element of her breach of contract claim (*i.e.,* damages), and she accordingly is not entitled to recover any additional amounts from Travelers.  *See*

---

[90] *Id.* at ECF 20 (Homeowners Policy Booklet, § I(D)(1)).

[91] *Id.* at ECF 18 (Homeowners Policy Booklet, § I(C)(1)).

[92] *Id.* at ECF 39 (Homeowners Policy Booklet, § I-II(2)) (alteration and emphasis supplied).

[93] *See id.* at ECF 11 (Homeowners Policy Booklet, § I(9) ("No action can be brought against us unless there has been *full* compliance with *all* of terms [*sic*] of Section I of this policy and the action is brought within the time limitations prescribed by Alabama law.") (emphasis supplied).

*State Farm Fire & Casualty Co. v. Williams*, 926 So. 2d 1008, 1015-18 (Ala. 2005).

In summary, plaintiff has not submitted sufficient evidence to support any of her breach of contract claims against Travelers, and summary judgment is due to be entered in favor of Travelers on all of plaintiff's claims.

## V. CONCLUSION AND ORDERS

In accordance with the foregoing, Travelers' motion to strike is GRANTED in part and DENIED in part.  Plaintiff's affidavit testimony that she did not rent a home in Los Angeles, California, is STRICKEN.  In all other respects, the motion is DENIED.

Travelers' motion for summary judgment is GRANTED, and all of plaintiff's claims are DISMISSED with prejudice.  Costs are taxed as paid.  The Clerk is directed to close this file.

DONE this 20th day of January, 2017.

_____
United States District Judge